The first case of the morning, 413-05-45, Johnson v. Executive Committee of the Board of Trustees of the State Retirement System. For the appellant, Mr. Hsu. For the applant, Mr. Weinstein. You may proceed. My name is Michael Hsu. I represent the appellant in this matter. This is a case where the appellants are requesting that this court reverse the Circuit Court's decision in which the Circuit Court ordered that the appellant has to pay back the appellee $27,161.10 because the appellant violated the Illinois Pension Code in that she got double recovery of Illinois work comp benefits and short-term disability benefits, short-term disability benefits to diversity. So there's double recovery. And it's my contention that, one, she did not violate the statute. She did not violate the Pension Code. And two, if any money does need to be paid back, it should be only in 40 and 1 7th weeks, not the 75 weeks or the $27,000 that was ordered by the Circuit Court. It should be more, it should be what the claims panel had ordered. And the reason for it is this, Your Honor. I'll be really brief. One, there's no, there was no jurisdiction for the appellee to claim that any subrogation needs to be established. And the reason for that is because, according to Hill Freight Lines v. Industrial Commission, if the respondent is going to claim some type of subrogation lien, some type of credit, that needs to establish that at the time of trial, arbitration or commission. It needs to be brought at the time of arbitration or commission. And that did not happen. The respondent's going to... How did they get there? How did they get to... Yeah, they just walk up and say, you know, we're not the employer, but a while ago we did some other stuff. We gave this lady some money. We ought to get it back. What... You want her in front of the arbitrator and hold up your hand or... Well, Your Honor, the appellee is connected to the university... The appellee is connected to the respondent. At the time of the arbitration, Ms. Johnson had a work-con claim against the University of Illinois. That's where she's an employer. And who she represents... Do they control each other? The University of Illinois tells the retirement system what to do? I mean, I understand that there's a connection that we would be aware of, but I don't understand what part they would play at an arbitration hearing. Well, if the university is going to claim some type of... The university isn't. The university isn't? I thought it was the state retirement system. The state retirement system is connected to the state university. So are you. You're a taxpayer. I'm connected to the judicial retirement system, but they don't have any control over me, and I don't have any control over them. Well, the university should have... They are connected to them, and they do have control. The university does have control over the state retirement system. I'm a part of the state system. How do they have control over it? Because the university should have contacted CSRS and said... Or CSRS should have contacted, well, we paid this much out. We want to claim a credit. Could Eastern Illinois University have come in and said, because she got paid too much, and we are part of the state university retirement system, that is, our employees can benefit from it, even though the state university retirement system isn't going to do anything about it, we want to do something about it. Could they wander in and say that? Did you say this? I said Eastern Illinois University. Or Western, or Illinois State, or whoever. They just wander in off the street and say, you know, I don't like what's going on here. No, Eastern University is not connected to the University of Illinois at Vanishing Point. But they're connected to their state retirement system, university retirement system. Yeah, they're connected to the retirement system. And if the university retirement system pays out benefits that they shouldn't, that is to the disadvantage of every university employee in the state. That's true, Your Honor. But if Eastern, if Yvonne Johnson was suing Eastern, then yes, CSRS has a duty to talk to Eastern and to find out what type of credit they're going to establish. But in this case, she only worked for the University of Illinois at Vanishing Point. It's a different university. It's a different entity. I see what you're trying to say, Your Honor. But where does the money come from? The money comes from the state retirement system. That's true. So I, you know, I just wonder about these, maybe these other employees ought to be showing up. I don't think this argument is overreaching or stretching and saying, well. What's your best case that says that they should have participated in arbitration and made a claim there? Well, Hell Freight Lines versus the District Commission. It's established that whenever, if there's going to be a credit establishment. That sounds like an employer. That is an employer. Hell Freight Lines? Yeah. They're not in the state retirement system. It isn't an employer. No, but the University of Illinois is the employer and the state retirement system is connected to the University of Illinois. What's your best case that says that connection makes them obligated to participate in workman's compensation cases? The cases I have are in my briefs, Your Honor. But are they all employer cases? Are they all employer cases as in? Well, the employer is the one that is before the commission. The employer is the one that's participating in arbitration. The employer is the one that is having to pay if payments are going to be made. Oh, well, I don't get the. Go ahead. I only, I'm not sure. So you're saying it was brought by the employer? Yeah. I'm not sure, Your Honor. I know, though, that the basis, the legal principle I cited establishes that if a credit is going to be established, it needs to be established at the time of arbitration before the commission, and that never happened in this case. So, therefore, I'm arguing that they have no jurisdiction. Two, I'm also arguing that based upon the pension code. They didn't even know about it, did they? What? At the time of the arbitration. Respondent, are you telling me they didn't know about it? They didn't know about the workers' comp benefits at the time of the arbitration for the disability from SURS, did they? I don't, I'm not sure, Your Honor. I don't believe they did. Then how can they argue it? But, Your Honor, they had a duty to find out, you know, from CSRS if there was any benefits that were owed, if there was any credit. The employer, which is the University of Illinois, and then SURS, which is connected to the University of Illinois, they had a duty to find out if any benefits were going to be owed. So, whether they knew it or not at the time of arbitration, I don't know. But, I mean, according to the case law, if a credit is going to be established, it needs to be established right there and then. Now, whether they knew about it or not, that doesn't matter, Your Honor, because they had a duty to find out about it. So, they had a, I mean, if a credit is going to be established. How would they have gone about finding out? How would they have gone about finding out whether a credit is going to be established? Well, I guess they would contact, you know, to find out if any short-term disability was paid. And then if any short-term disability was paid. Contact who? They would contact, you know, the university or the contact SURS to find out if any short-term disability benefits were paid. And if short-term disability benefits were paid, then they would claim an overlap. I'm just saying, Your Honor, that I don't think that the appellee can claim any of this money now because it wasn't brought up at the time. Now, whether or not the appellee knew about it or the appellee informed the University of Illinois' counsel about it, I'm not sure. But the counsel had to have brought it up at the time of the trial. I thought that, you know, like when you don't know about something, it's perhaps the duty of the people that are either bringing the action or benefiting from the action that ought to be notifying those other people that are parties of interest. So you're saying then that Ms. Johnson... I'm not saying... I'm asking a question. I mean, should... You said they... They didn't know about it, but they should have. Typically, when we're involved in judicial or quasi-judicial proceedings, the people who are before the proceeding give notice to the other parties or the other people who could be parties or persons of interest and tell them about it. I see. They send out notice. Well, that's what I'm saying, Your Honor. I'm saying that the employer, like you said, had a duty to send out notice to find out, well, is there any credit involved in this case? You know, are they going to claim a credit? I'm saying the university is part of CERS. CERS is part of the university. So since they're joint agencies, the university should have brought notice. They had a duty to, you know, investigate, like you said, and make their claim. If they don't make their claim, then it's waived.  Second, Your Honor, according to the pension code, I think a broad interpretation of the pension code, according to case law, it says that basically that portion of the pension code is to prevent double recoveries. I think a broad reading of it is meant to basically deter fraudulent claims. You know, so that's... So double recoveries in the absence of fraud are okay? Yes, Your Honor. And the reason is because... I said banks would be interested. Well, in this case, Your Honor, I think it's true because the university went ahead and paid, CERS went ahead and paid her these benefits for about two years, 2005 to 2006. And then only after the case was over did, like years later, did they notify her that they want their money back. Did they voluntarily pay those things, or did somebody ask them to pay? Ms. Johnson applied, and they asked. But she thought she was getting retirement benefits. Well, should she have known that she was getting what she was getting? Your Honor, I think the university had a duty to cut her off and say, Hey, you're getting this and this at the same time. And then after the case is tried, they don't claim a credit, they don't bring this up at the time of trial. And then two years later, they send her a letter saying, You owe this much money now? I mean, that's insane. Because if they're going to claim a credit, at least bring it up while the case is still going on. At least give her notice while she's receiving the benefits. Or at least give notice at the time of the trial. To give notice two years later is asinine. And that's unfair, Your Honor. And now here's this woman who's getting social security disability. Unfortunately, all the money is gone. And now her retirement benefits are being segregated. And she has to pay like $700 or $600 every month to pay back the $27,000. That's unfair, Your Honor. I think the university had a duty to, one, bring it up at the time of trial, or give her notice or stop it and say, Hey, you can't get both. Cut her off. Here's this woman, she's getting retirement benefits. University is giving her both. And now to claim it two years later is ridiculous. And now number one to pay for the claims panel, and now we're here, and now she's got to pay back the $27,000? No, that's unfair. But the notice that she received, when she was notified she would get the SURS benefits, that notice said that any benefits received could be offset by workers' comp awards. When was that dated, Your Honor? Well, I believe it was at the time she was notified, back in August of 2003 or thereabouts, that she would get SURS benefits. Didn't she, didn't along with the letter saying you're going to get this, didn't they also include a notice, however, it's subject to an offset from any workers' comp benefits? Your Honor, that might be true. There might be a letter, she might, I don't know, she might have got a letter, or they're claiming she got a letter that says that, you know, there might be an offset of those benefits in 2003. She didn't get the benefits until 2005, 2006, you know. I mean, so you're saying she applied in 2003, and she got the benefits in 2005, 2006, I mean. Okay, well, walk me through this. When did she start getting the benefits? We're claiming it in 2005, 2006. From the state university retirement system? Yes, yeah. And then she was also getting workers' comp benefits, too. When did she start getting those? 2005, I believe, 2006. That's the overlap we're claiming. I thought she was getting some benefits in 2002 or 2003 from workers' comp. Oh, I don't know. No? I don't know, Your Honor. I don't, I think it's 2005, 2006. All right. But irregardless, Your Honor, at the claims panel, when she testified that it was just for retirement benefits, they believed her. They didn't believe that she was defrauding anybody or that she was double-dipping, intentionally double-dipping. It's specifically stated by the claims panel, which, you know, established, you know, they were looking at her credibility, and they heard her testimony, and they saw her. So they didn't think that she was intentionally, you know, that she, you know, she didn't, she got noticed and she was trying to take. Anyway, irregardless, my argument is because there was no intent to defraud, I don't think you should apply this case. I think the statute was meant to protect against, you know, against fraudulent claims, and the heroin wasn't a fraudulent claim. And then lastly, Your Honor, I just want to point out that I think if you do find that Ms. Johnson has to pay back any money, I think it should be consistent with the claims panel decision, which is 41 7th weeks. At the time, at circuit court, this was brought up. But instead, the circuit court just bypassed the whole issue, and I don't know why, but he asked me if I calculated it. I said no, but it's not my job to calculate it. The claims panel wanted the search to be calculated. So the judge just said, well, you know, it's going to be the 26,000. And that doesn't make sense. I'm going to let you comment on that and rebuttal, because you brought it up, so you can pursue that argument. But I've got a couple more questions about the, my notes show that she started getting workman's compensation benefits in December of 2002. Okay, Your Honor. Then after that, she would have received a letter from CSRS saying, we're going to give you disability benefits. This is in November of 2003, and we're going to make them retroactive to August of 2003. And accompanying that was the notice that, you know, these benefits, which don't have anything to do with retirement, because she hadn't retired yet, will be reduced by an amount equivalent to workers' compensation awards. So she's getting workman's comp before she gets anything from the State University Retirement System. And the State University Retirement System tells her five, six months later, when she starts getting those benefits, they wag their finger and say, you know, this is going to be, this could be reduced. And then three years later, she starts getting retirement benefits when she actually retires. So that timeline is considerably different than what you represent. I concur with your timeline. Okay. I concur with that. Well, that doesn't change your point about them showing up. Years later. Years later. But it does show that she was notified, she was told at a time when she could not believe that she was getting retirement because she hadn't yet put in her retirement papers, that she was getting workman's compensation benefits and then began receiving CSRS benefits at a time when she knew or should have known that they told her, you're not supposed to get both of these. There's going to be a credit. Okay. Well, I concur with your timeline. But as far as what she believed or didn't believe, the Clearance Panel, she testified she believed she was getting retirement benefits, and the Claims Panel basically believed her if you read the transcript or read the decision. I'm sorry, read the decision. How do you get retirement benefits before you retire? There may be benefits from the State University Retirement System, but that's not the same thing. Well, her impression was that it was supposed to be for retirement benefits. And that's what the Claims Panel believed. In terms of her doing any? Yes. Without having any attempt to? Right. Well, basically, Your Honor, I contend that no money should be paid. It sounds like you're going to have her pay something, but if you're going to have her pay anything, it should be 40 and 1 7th weeks. We're supposed to give you a hard time during oral argument so that we can refine the issues. You said it should be 40 and 1 7th weeks per the Claims Panel. Why? Because the only overlap was between August 17 of 2003 and May 24 of 2004. That's when she received benefits. And that represents 40 and 1 7th weeks. After that, there's no overlap. So why should she have to pay more than the overlap? I think what they're trying to say is they wanted the full 75 weeks, which represents the entire amount of benefits, that she received between December 16 of 2002 and May 24 of 2004. But the only overlap was for that period of time, and that represents 40 and 1 7th weeks. Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the Court. My name is Michael Weinstein. I'm the General Counsel for the State University's Retirement System, and for purposes of this case, I've also been designated as a Special Assistant Attorney General. Your Honors, in view of the questions that you've asked Mr. Hsu, I'm going to try to make my argument very brief. First of all, there's simply no connection between the University of Illinois and the State University's Retirement System. They're two separate entities. The State University's Retirement System is clearly not a department of the University of Illinois. There's no case that Mr. Hsu can point to that requires State University's Retirement System to somehow magically appear at a workers' compensation hearing and ask for an offset. Secondly, I think the statute is very clear. It does not require intent. It simply is meant to prevent double recoveries, and that's exactly what occurred in this case. Ms. Johnson received both the workers' compensation permanent benefits, disability benefits, and she also received CERN's disability benefits. And let me point out that on page 128 of the record, there is the application for disability benefits filed by Ms. Johnson, signed at the bottom. So I don't see how Mr. Hsu can argue that Ms. Johnson thought she was applying for retirement benefits. She was clearly applying for disability benefits from CERN. Those benefits were granted, and as Justice Turner points out, and Justice Knyk as well, the award letter very clearly states that the individual is subject to a possible offset, if we're talking about a workers' compensation award as well. And furthermore, this individual actually had had four other disability claims with CERNs in prior years, and so she received that same notice four different times. This was the fifth time that she received notice of the offset. Well, counsel, let me ask this. When CSRS granted the disability, could they have not contacted the university to determine if she was getting workers' comp disability, either TTD or permanency? I think that's what counsel's talking about. I suppose CSRS could have, because on the application, there is an indication that there was an on-the-job accident that gave Rice his potential disability. But there's no requirement in the law that CSRS do this. How about the opposite? Should there be a requirement in the law that the employer do it? Your point about there are two separate entities, but there is a practical connection. So why doesn't the university say? Because the university has to know that she's received CSRS benefits, don't they? Because it would have affected her employment. Yes, the university would certainly be aware that she applied for CSRS benefits, because part of that disability application requires the employer to fill out a page stating what this individual has been doing as a job description. That could certainly be possible. That would be a better level of communication. It might very well be, but it's not required by the statute. There's nothing in the statute that requires that to be done. So as I pointed out, CSRS is not a department of the University of Illinois, as Mr. Sue has argued in his brief. And by the way, with respect to his argument that CSRS should have appeared at the workers' compensation proceeding and raised the question of offset, that issue has never been raised by Mr. Sue below. It was never raised before the claims panel. It was never raised in the trial court. He's raising that issue for the first time in this court. I'd suggest to you that that issue actually has been waived. But as we've said, the issue has not been waived. Forfeited, counsel. Forfeited, not waived. Forfeited, not waived. Pension over relinquishment of a known right is waived. Thank you, Your Honor, for correcting me. Additionally, with respect to the amount of the offset, once again, the plaintiff never objected to the amount of the offset. In fact, at the claims panel hearing, it's very clear that counsel agreed as to the amount of the offset. The record reflects only the $27,000 amount of the offset. It reflects nothing else to support what the claims panel came up with, which was this method of 40 and some odd weeks. There's nothing within the record that was presented by Mr. Sue at the claims panel hearing to support that. Well, is there something within the claims panel decision that supports that? Does logic support it? Does the record support it? Your Honor, I don't believe that the logic of the claims panel... How about the timeline? I don't think the timeline supports it either. I believe our brief sets out a timeline that adequately supports the $27,000 offset. So overlap doesn't matter? No, there is an overlap. But we computed, service staff computed the overlap in a different method. So you, in one sense, you agree about the overlap, but the application of that overlap or the way that it's interpreted, you come up with two different figures.  At pages 17 and 18 of our brief, we argue with respect to the amount, actually on page 19, and we, service staff, believes that the offset period began on January 10, 2004, which was the day following the point that Ms. Johnson reached maximum medical improvement, according to the workers' comp decision. So we were talking about permanent benefits at that point going on. And it ran initially for 75 weeks, which was the amount that she received, permanent disability benefits. It then continued on until January 31, 2006, which is the day she retired, because of a wage differential offset. So are you saying, counsel, that she was getting TTD until January 9, 2004? Correct. And then the permanency starts January 10. Kicks in on January 10 of 2004. Correct. And is that what the record shows? I believe it does, yes, Your Honor. Okay, well, why did the executive committee reject that argument? It seems logical. I don't know the answer to that question. Mr. Hsu did not present any evidence to support what the executive committee came up with. Okay, well, the executive committee decision was appealed to the circuit court, correct? That's correct. Did you appeal? I did. Well, when Mr. Hsu filed his appeal, as part of my argument, I argued that the only thing that was supported in the record with respect to the amount of offset was the $27,000. Well, was it incumbent upon you to appeal the amount that the executive committee determined, which was the $40,000 and $17,000? I don't believe so. I don't believe it was incumbent upon me to actually file a cross-appeal with the circuit court with respect to the amount. Well, I don't know the answer to that. That's why I ask it. But say there had been no appeal by the claimant, if you had not filed your own appeal, then this would stand. That's a very interesting question, and frankly, Your Honor, we wondered whether or not Ms. Johnson would file an appeal, and we had not decided in our own minds what we would do if we got down to the 35th day. As it turned out, she filed her appeal well before the 35 days were up, I believe. At that point, we – I get that, but to me that almost suggests that when she filed her appeal, then you should have filed your own appeal. Respectfully, I don't believe that we had to. Okay. Again, because the record itself reflected only one amount, which was the $27,000. It did not reflect any basis for coming up with the 40 weeks that the claims panel and the executive committee – The permanency award that she received under workers' comp, her PPD, was that paid lump sum, or was it paid over a certain amount of weeks or months? I'm not sure, Your Honor. I think it was probably paid lump sum. I'm sure that Mr. Suh could answer that question if need be, but it certainly reflected a period of time. This particular – the workers' comp case went through arbitration. It went through the circuit court, so I don't know if ultimately Ms. Johnson did not receive her permanent benefits until after the circuit court decision, in which case I suspect it would have been a lump sum. But it certainly reflected a period of time going forward, the 75 weeks that we mentioned here. Unless there are any further questions, thank you very much, Your Honors. Thank you. Mr. Suh? Your Honors, actually, it was – the award was a lump sum. I don't understand the logic of the appellee, and I totally concur with the logic of the claims panel. In fact, I didn't have to – as the appellee, I don't have to bring up the – or support the argument of the claims panel as far as the logic. The claims panel brought it – you know, they themselves said that their decision itself would be binding. And it seems to me like if you're going to have – the only thing the appellee can claim is the overlap. And the claims panel's decision was very logical. Well, you said you don't understand his logic. I think I do understand, but I want to hear what your response would be. His logic is that she was getting TTD up until January 9 of 2004, at which time the permanency award, or the PPD, kicked in, which would be from January 10. That's his logic. But was she getting short-term disability benefits for the period of time between the TTD and the PPD? Well, I don't know. Was she? No. No, she wasn't.  So she wasn't getting TTD until January 9, 2004. If not, then that would refute his argument. That's his logic. Well, was she or wasn't she? She did not get any PPD. The whole time she got TTD. I didn't ask you about PPD. I asked you about TTD. Yeah, she got TTD, yes. Up until January 9, 2004. Well, what's wrong with his logic? You're getting temporary total disability until January 9, 2004. This is according to counsel's argument. And then the permanency award, or the PPD, kicks in then starting January 10, 2004. The permanency award follows the temporary award. What's wrong with that logic? Because the only... I guess I would have to look at the dates, but you have to look at the overlap of... at the same time that he's claiming she was getting TTD and... No, no. This only applies to temporary total disability benefits. The pension should only apply to TTD and short-term disability benefits. Why would... If she was getting short-term disability benefits at the same time she was getting permanent partial disability benefits, then it wouldn't apply. It should only be TTD and short-term disability benefits. That's when they can claim the credit. I didn't follow that. Say that again. Okay, so if you're going to claim... You can't get TTD and short-term disability benefits at the same time because they contradict each other. Short-term because one is non-occupational, one is occupational. TTD, non-occupational. But if she got PPD, permanent partial disability benefits, that doesn't apply here because this only applies to TTD and short-term disability benefits. If she was getting... What only applies to TTD? What only applies to TTD? Short-term disability benefits. You can only claim... You can't get both at the same time. You can't get TTD and short-term disability benefits at the same time. But if you're claiming PPD, I mean, that doesn't apply here. So if she got PPD, permanent partial disability benefits, then it wouldn't apply. Then it wouldn't matter. TTD and short-term disability benefits are the same thing. You can't get both at the same time. But if it's PPD, permanent partial disability benefits, then that's different. Thank you, Your Honor. If there are no other questions... Thank you. Take the matter under advisement.